The next case, Brian Byron Lee against Industrial Commission 5100541. Council, please. Good morning, sir. My name is Leslie Collins, and I represent Byron Lee. Council, we just ask that you review this case as we can't tell by the Commission's decision whether or not they actually analyzed the case. They basically just affirmed and adopted the arbitrator's decision in this case. What's the difference between the $542.67 and the life benefits? Oh, I think it's around $300 additional dollars a month, I believe. Or, I mean, per week. Anyway, this is also a case of whether or not my client is an odd lot from total. He's not... I mean, that's the basis. I wanted to ask you to clarify. That's the basis you're proceeding on. Yes. You're not proceeding on the fact that the evidence demonstrated that he was unable to work. Right. We're saying... I should say the evidence doesn't establish he's permanently and totally disabled. You're alleging he fell into the odd lot category. Correct, Your Honor. Correct. If we look at the cases as was just discussed, as far as an odd lot from total, my client said he's not medically disabled, but as far as... he is considered incapable of performing services except for those in which there is no stable market. If we look at what my client did in this case, he actually had the opportunity to work with two vocational rehab specialists. Both of them were hired by a respondent. My clients completed 460 job searches with the first vocational rehab specialist, was not able to find a job with that gentleman and... Was the vocational evidence established? Did it establish that he was not employable and not... I believe so. I mean, I believe that he's... that Mr. McKee believes that he's employable, but he applied for 460 jobs with Mr. McKee and couldn't find a job. I mean, I think that tends to indicate that he's not employable. I mean, you can say everybody is employable, but you have to have a... you know, there has to be a job out there, you know, for you to... for you to get. And then also, after working with Mr. McKee, Mr. Lee also applied for an additional 180 jobs on his own, and that is part of the record. Did the vocational experts testify? There was testimony by June Blaine. She's the second vocational... And what did she opine relative to the claimant's ability to be employable? She... it was her opinion that he was employable. However, she said not at the rate of pay that he was at before. She said at a rate of from $9 to $11 an hour. However, after working also with Ms. Blaine, there was no... there were no successful... no... he was not able to obtain work. And if we go through this, Ms. Blaine worked with him specifically. She tried to retrain Mr. Lee. Mr. Lee's job originally was that of an elevator constructor. She wanted to retrain him to be an elevator inspector. If you look at the testimony at trial, Mr. Lee testified that he was not physically capable of performing the jobs of an elevator inspector due to his physical restrictions. And he also testified that he didn't think he had, and I'm going to quote exactly what he said, didn't think he had the stuff to be an inspector. But as far as the physical restrictions, he does have permanent restrictions of 15 pounds lifting. And it's my understanding, as Mr. Lee testified at trial, that these elevator inspectors have to load weights onto these elevators to test the weight limits. So that would be something outside of his restriction, even though Ms. Blaine decided, okay, that would be a good job for him to try to get. But she more or less testified that he did not cooperate in that retraining. She did. She said he did not cooperate in that retraining. So we don't know whether he could have been an elevator inspector or not. Well, we don't know. He went through the training. He took the test. He failed the test. According to the record, anyway, he stayed for two and a half hours in an eight-hour, open-book, multiple-choice test. That's correct. And if you look at Mr. Lee's testimony, he testified he couldn't keep up with the material. He had difficulty concentrating during the test. On a side note, not only did he have the physical restrictions, but if you look at Dr. Swarm's testimony, he says that my client was also suffering from depression as a result of this injury. But anyway, Mr. Lee testified his hand locked up several times and he was afraid and he was rushing. That's, if you look at page 51 of the actual testimony from the arbitration hearing. And also, Mr. Lee, he had several books that he had to thumb through to get, and that's the reason his hand, he said, or his thumb was cramping up and he was having difficulties. And he says he was afraid and he was rushing. I think that comes to the fact that, okay, he did finish in such a quick time period. If you look, I think he testified that at one point the instructor said, okay, at some point you just have to flip a coin and pick an answer. I think he was frustrated at that point. What you're describing is all facts that the commission, you know, had discretion to determine whether that bore more toward permanent total disability or wage differential. Right, and I think if we also talk about, you know, what that, I don't know what, looking at the commission's decisions, I don't know what they, if they analyzed anything. They adopted the arbitrator's decision. Right, well, the arbitrator, what, you know, if you look at her decision, she just says that the vocational evidence doesn't support the finding of permanent total disability. And she goes through, you know, saying that Mr. McKee believed, you know, the petitioner was capable of returning to the workforce. But she says nothing about, you know, his job attempts. I mean, she doesn't, to me, she doesn't analyze it. I don't think, you know, and of course with the case law, I think she, you know, she just, what she is pointing out is, okay, she's saying that, you know, okay, he failed this course and he had a lack of effort. But she's not, to me there's no analysis here like it should be with in the case law saying, okay, you know, he had these successful job attempts, or I'm sorry, these unsuccessful job attempts, and now, you know, at what point does the burden shift to the employer? You know, apparently, you know, they're saying he's employable. Well, he worked with two vocational rehab specialists and none of it was successful. So we just ask that, you know, that you find that my client is an odd lot permanent total and award him permanent total disability. Any further questions? Thank you, counsel. Counsel, please. Your Honors, my name is John Dietrich. I represent the Appellee United Technologies in this case. May it please the Court. It's our position that the decision of the Illinois Workers' Compensation Commission denying permanent total disability benefits to the petitioner and awarding wage differential, which was affirmed by the Circuit Court of St. Clair County, is not against the manifest weight of the evidence in this case. I think the appellant concedes that we're using a manifest weight of the evidence standard and that the Commission has the factual or the ability to make the factual determination as to whether or not the petitioner is permanently and totally disabled. In this case, in order for a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. And in this case, an opposite conclusion is not clearly apparent. The appellant is not, obviously, unemployable. His injury was limited to his left thumb and was a laceration injury to the thumb that required repair of a tendon injury. No other body parts were injured at the time of the accident. And there's no evidence that he had any limitations to any other of his body parts. There's no medical evidence stating he's permanently and totally disabled in this case. Medical experts, Dr. Tung, the treating physician, and Dr. Koo, respondents examining the physician, both agreed that he was employable in the open labor market with restrictions. In order to determine an exact extent of his restrictions, a functional capacity test was attempted, but the appellant failed seven out of nine performance criteria on the functional capacity evaluation test, and the therapist who performed the test noted that the profile was consistent with symptom magnification. He refused to perform some of the activities of the test, and the therapist concluded that he could have functioned at a higher level during the test. He was examined by Dr. Graham on behalf of the respondent after the functional capacity evaluation was performed, and his exam, he felt that he could work at a higher level than light duty based on the results of the functional capacity evaluation and also based on his clinical examination. When he examined the petitioner, he noted that he had dirt under his fingernails and also had a lack of atrophy in his left hand, despite the petitioner indicating that he could only use his left hand to gesture. One would anticipate that if one was only using their left hand to gesture, there wouldn't be dirt under the fingernails, and there would be some atrophy to the hand if he's not using it. The appellant asserts that he's qualified for an odd lot total status because of the sheer number of job searches. That's really what they're arguing. He had a large number of job searches, therefore he qualifies for permanent total disability benefits under the odd lot status. Somehow that qualifies as a diligent job search. Really it's not the quantity of the job searches that count, it's the quality. The evidence in this case shows that he did not conduct a diligent job search. Furthermore, it shows that he did not cooperate with vocational rehabilitation efforts. Mike McKee, the initial voc expert who tried to find the petitioner work, indicated that his efforts at finding work were inconsistent and that he failed on occasion to contact the minimum number of employers per the job placement plan. Also, his job search record revealed that he was trying to find employment that was beyond his vocational abilities. In addition, they had a job interview lined up for a security position and that had to be canceled because of an arrest and incarceration. So there's a showing from Mr. McKee and his records indicate that he did testify at the hearing, but his records indicate that he did feel throughout the course of his vocational attempts with Mr. Lee that he was employable. June Blaine, the second vocational expert that was hired by the respondent in this case, tried to retrain him. She thought that was the mode to take rather than try and find him work at these other jobs. She testified that the work as a qualified elevator inspector would be within his restrictions. She's a vocational expert, so I would assert that she would have a greater knowledge than the petitioner as to what the job qualifications would be for that position. She thought that was a good idea to use his prior experience in the elevator industry and put him in that position. She set up the classes for him. He attended the classes. The instructor commented, and it's in the record, that he was constantly out of the room on his cell phone during the classes and the instructor was worried that he was not focusing on the task at hand and what was being taught to him. He also not only did not fully participate in the training, but he also didn't fully participate in the testing itself. When the testing took place, it's an eight-hour open book test, as your Honor noted before. He used two and a half hours of the eight hours, and the evidence was that most people take seven or eight hours to take the test. Is there any evidence in the record that an elevator inspector is a stable job market? Well, I don't know that there's specific notation exactly to that effect, but I don't think the vocational expert would have tried to put him in that position if there was not a reasonably stable job market. She thought that he would have been able to get a job as a qualified elevator inspector had he finished the retraining and had he completed the testing and passed the test. Did she give any opinion as to what the compensation would be for an inspector versus his position he had at the time of injury? She testified that had he passed the test to become a qualified elevator inspector, that the salary would have been commensurate with what he had been making as an elevator constructor. Ms. Blaine then, after he failed the test, she went further and tried to take a different path, tried to get him additional computer skills that would make him more marketable as an employee in the job market. He initially completed the first part of the course, but then didn't complete the second part of the course, and his reason for not completing the second part of the course was because he didn't want to drive ten minutes farther to complete the course because it was ten minutes farther away from where he lived. Was he prohibited from taking the test on the second or third time? After that happened, they ceased vocational activities because of his lack of cooperation. There had been a pattern throughout the case of his lack of cooperation, and they felt that it was just going to continue and there was no benefit to continuing to try it. They did continue to provide maintenance benefits while he did his job search on his own, but they didn't feel that any further benefit was going to be had by continuing to try and retrain him with voc experts. She basically testified that he didn't give a good faith effort in trying to work with the vocational experts in this case to find work. I'm just curious. All of us have taken tests our entire lives, bar exam being a major point, and some pass, some fail. You take it again, and you may do better the second or third time. There was no attempt at retaking the test. I think it was based on the information that she was provided. She made a decision that it was not going to be prepped. It seems kind of foolish to do stuff with a wage differential award. Well, I think the testimony was put on that he could find work. It was obviously less than what he was making. They have been complying with the wage differential award. Obviously, they weren't pleased with that, but that's the way it is, and they didn't feel that issue. It would make more sense to work further with someone to get a wage commensurate with what they had with the time of the accident as opposed to a lifetime differential award. Well, I'm not going to agree or disagree with Your Honor. I think that they had decided that at that point it was a lost cause. The appellant presented no vocational testimony in this case that he was unemployable. They cite a case of Meritech, and they indicate that it's similar in nature to this case. In that case, they had a vocational expert who testified that the person was unemployable in the open labor market. Basically, it's our contention that the decision of the Illinois Workers' Compensation Commission denying permanent disability benefits to the appellant is not against the manifest weight of the evidence. Their decision is supported by substantial, competent, and credible evidence and should be affirmed. Thank you. Your Bible, please. Thank you. I wanted to point out, if we look at Ms. Blaine's testimony, in her testimony, I believe specifically on page 38 of her deposition, she testified that Mr. Lee's restrictions would probably require him to avoid use of tools as in his previous job. I would assume we don't have the specific job duties of an elevator inspector, but I'm assuming that would require use of tools. As I stated earlier, Mr. Lee testified that it requires lifting heavy weights into an elevator to test the capacity. The commission was correct then in stating that the claimant did not provide any vocational testimony? That he was unemployable? That's correct, Your Honor. All right. And the other part that's interesting to me is that the commission found in the alternative, the petitioner is alleging that he is entitled to a weight differential under 81 for the workers' compensation. Is that correct? Yes, that was, yes. Is that what he got? That's what he got, Your Honor, yes. Why are we complaining? Well, it's our belief that he's permanently disabled. Well, but if you gave that as an alternative to the commission, they'd comply with your wish. Thank you. The court will take the matter under driver for disposition. We will stand recess until 9 o'clock in the morning.